# United States District Court
# District of New Jersey

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. Cathy L. Waldor |
| v. | : Mag. No. 21-9181 |
| GEORGE A. LEGUEN, a/k/a "Jage Leguen" | : CRIMINAL COMPLAINT |

I, Paul D. Bataille, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent for the Internal Revenue Service, and that this Complaint is based on the following facts:

## SEE ATTACHMENT B

Continued on the attached page and made a part of this Complaint.

_____
Paul D. Bataille
Special Agent
Internal Revenue Service

Attested to me by telephone pursuant to FRCP 4.1(b)(2)(A), March 24, 2021, in the District of New Jersey

HONORABLE CATHY L. WALDOR      _____
UNITED STATES MAGISTRATE JUDGE   Signature of Judicial Officer

**ATTACHMENT A**

**Count One**
**(Wire Fraud)**

From at least as early as in or around August 2020 through in or around January 2021, in Bergen County, in the District of New Jersey and elsewhere, defendant,

**GEORGE A. LEGUEN,**
**a/k/a "Jage Leguen,"**

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds, to wit:

| Count | Approximate Date | Description |
|---|---|---|
| 1 | August 31, 2020 | LEGUEN caused to be deposited approximately $149,900 from the Small Business Administration to GJEG LLC's bank account at Bank-1, resulting in an interstate wire transmission. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## Count Two
## (Money Laundering)

On or about October 2, 2020, in Bergen County, in the District of New Jersey and elsewhere, defendant

**GEORGE A. LEGUEN,
a/k/a "Jage Leguen,"**

did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a greater value than $10,000, that is, the transfer of approximately $64,987.72 from an account at Bank-1, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1957 and Section 2.

## **ATTACHMENT B**

I, Paul D. Bataille, am a Special Agent with the Internal Revenue Service. I have knowledge about the facts set forth below from my involvement in the investigation, my review of reports, documents, pictures, videos, witness interviews, and discussions with other law enforcement officials. Because this affidavit is submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact that I know concerning this investigation. All statements described herein are relayed in substance and in part. In addition, where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## **Background**

### *THE ECONOMIC INJURY DISASTER LOANS PROGRAM*

1. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.

2. The provisions of the CARES Act, in conjunction with an officially declared disaster by the United States Government, allowed for the Small Business Association ("SBA") to offer funding through the COVID-19 Economic Injury Disaster Loans ("EIDL") program to business owners negatively affected by the COVID-19 pandemic. More specifically, the EIDL program is an SBA program that provides low-interest financing and advances (or grants) to small businesses, renters, and homeowners in regions affected by declared disasters.

3. In order to obtain an EIDL, a qualifying business must submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period is that preceding January 31, 2020. The business entity must have existed in an operational condition on February 1, 2020.

4. Using the SBA online portal, EIDL applicants submit personal and business information in support of each EIDL application. The EIDL loans/advances application process required minimal documentation and information from small businesses to process the loan for approval. The application includes a paragraph in which the applicant affirms that the information submitted is true and correct under the penalty of perjury and applicable criminal statutes.

5. EIDL applications are submitted directly to the SBA and processed by the agency with support from a government contractor. The amount of the loan/advance, if the application is approved, is determined based, in part, on the information provided by the applicant about employment, revenue, and cost of goods, as described above. As a general matter, the loan amount for most businesses, other than rental businesses and non-profit and agricultural businesses, is calculated the same way: gross revenue reported, less cost of goods sold reported, divided by two. The maximum loan amount is capped at $150,000 per entity.

6. Pursuant to the provisions governing the EIDL program, loan/advance proceeds must be used by the receiving business only on certain permissible expenses. More specifically, the EIDL funding may be used by the business to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the COVID-19 disaster not occurred.

### THE RELEVANT ENTITIES AND INDIVIDUALS

7. At various times relevant to the complaint:

    a. Defendant George A. Leguen ("Leguen") resided in or around Bergen County, New Jersey.

    b. GJEG LLC ("GJEG") was a company established in New York, which Leguen is believed to own with Individual-1. Individual-1 resided in or around Bergen County, New Jersey.

    c. Until in or around June 2019, Leguen and his associates operated One Fifty One Restaurant and Lounge ("One Fifty One Restaurant") in New York City. GJEG was believed to be doing business as One Fifty One Restaurant.

    d. Leguen purported to own 151 Corp. According to SBA documents, Leguen stated that 151 Corp. was located at 151 Dyckman Street, New York, New York (the "Dyckman Address"), which was the same location as One Fifty One Restaurant.

    e. Bank-1 was a financial institution headquartered in San Francisco, California.

8. GJEG maintained a business account at Bank-1 (the "5202 Account"), with a business address of the Dyckman Address. In the 5202 Account opening documentation, Leguen was listed as a "Key Executive with Control of the Entity" and Individual-1 was listed as "Owner with Control of the Entity." Leguen listed a Garfield, New Jersey address (the "Garfield Address"),

while Individual-1 listed a Bronx, New York address (the "Bronx Address"). Leguen also maintained a personal installment loan account at Bank-1 (the "0001 Account").

## The Scheme to Defraud

### *FALSE EIDL APPLICATIONS TO SBA*

#### *Application-1*

9. On or about August 2, 2020, Leguen submitted an EIDL application ("Application-1") on behalf of GJEG. Application-1 listed Leguen as a 51% owner and Individual-1 as a 49% owner of GJEG. Application-1 listed GJEG's industry as "Eating and Drinking Places," which law enforcement believes to be referring to One Fifty One Restaurant. Leguen listed GJEG's business address as the Bronx Address.

10. In Application-1, Leguen certified that GJEG's gross revenue for the 12-month period preceding the COVID-19 pandemic was $1,380,000, the costs of goods sold during this period was $757,000, and rental losses due to the pandemic was $70,000. Leguen further certified in Application-1 that GJEG had 12 employees as of January 31, 2020. Leguen listed the 5202 Account as the account to which the EIDL funding should be disseminated.

11. The SBA approved Application-1. Based on the gross revenue reported by Leguen, Leguen qualified for maximum funding. On or about August 27, 2020, Leguen electronically signed the Loan Authorization and Agreement.

12. Application-1 contained false and/or misleading statements and misrepresentations. Further, law enforcement has probable cause to believe that One Fifty One Restaurant ceased operations in advance of February 2020, rendering GJEG ineligible to receive EIDL funding.

13. Law enforcement obtained records demonstrating that One Fifty One Restaurant was not operational in February 2020, making GJEG ineligible for EIDL relief. More specifically, records from the New York Division of Alcoholic Beverage Control ("NY DABC") demonstrate that One Fifty One Restaurant ceased operations in or around June 2019, prior to the COVID-19 pandemic, and that New York revoked its liquor license in 2019 based on various violations. Law enforcement conducted physical surveillance of the Dyckman Address on or about January 4, 2021 and observed that the space previously occupied by One Fifty One was for rent.

14. In addition, Leguen misstated GJEG's gross revenue in Application-1. A review of 5202 Account records do not support the gross revenue or cost of goods sold reported by Leguen in Application-1. Further, according to information provided by the IRS, GJEG has never filed any tax returns, including in 2019, the year preceding the COVID-19 pandemic. Leguen's personal tax returns fail to account for the gross revenues reported in Application-1. Individual-1's tax returns likewise do not account for the gross revenues reported in Application-1. Moreover, law enforcement believes One Fifty One Restaurant closed in or around June 2019, which undermines the revenues Leguen certified.

15. Leguen also misstated that GJEG had 12 employees as of January 31, 2020. According to New York State Department of Labor ("NYDOL") records, GJEG has never paid wages in New York, nor does NYDOL have any record of GJEG's existence. Moreover, as noted above, law enforcement learned that One Fifty One Restaurant closed in or around June 2019. Further, neither Leguen's nor Individual-1's tax returns reflect wages paid to employees.

16. Finally, Application-1 lists GJEG's business address as the Bronx Address, which is a residential address that is part of a large apartment complex.

17. On or about August 31, 2020, the SBA transferred approximately $149,900 to the 5202 Account, resulting in an interstate wire.

### *Applications-2–3*

18. Individual-1 submitted an EIDL loan application on behalf of 151 Corp on or about September 12, 2020 ("Application-2"). In Application-2, Individual-1 certified Individual-1 was 100% owner of 151 Corp, doing business as Lotus Café. In Application-3, Individual-1 reported $1,255,000 in revenue and 13 employees. Individual-1 listed the GJEG Account as the account to which the EIDL funds should be disseminated. The SBA denied Application-2 as duplicative.

19. On or about September 27, 2020, Leguen submitted an EIDL application ("Application-3") also on behalf of 151 Corp. In Application-3, Leguen certified he was 100% owner of 151 Corp. and listed 151 Corp's industry as "Eating and Drinking Places." Leguen listed 151 Corp's business address as the Dyckman Address (i.e., the same address as One Fifty One Restaurant). He listed the trade name as Lotus Café.

20. Application-3 listed 151 Corp's gross revenue for the 12-month period preceding the COVID-19 pandemic as $1,295,000 and the costs of goods sold during this period as $550,000. Leguen stated in Application-3 that 151 Corp had 15 employees as of January 31, 2020.

21. Application-3 listed the 5202 Account as the account to which the EIDL funding should be disseminated.

22. The SBA denied Application-3 as duplicative. Based on the information Leguen included in Application-3, had the SBA approved Application-3, he would have received the maximum loan amount of $150,000.

23. Application-3 contained false and/or misleading statements and misrepresentations.

24. 151 Corp, doing business as Lotus Café, was not operational as of February 2020. In fact, law enforcement learned that Lotus Café is the name of a restaurant that was previously located at the Dyckman Address before One Fifty One Restaurant was opened. Records obtained from NY DBAC indicate that "151 Dyckman Corp dba Lotus Café" occupied the Dyckman Address space in or around 2017. Further, law enforcement learned that NY DOL has no records related to 151 Corp., indicating that the entity has not paid wages to employees.

### *Use of the EIDL Loan Proceeds*

25. Bank records for the 5202 Account show that Leguen and/or Individual-1 used the EIDL money for improper, non-business purposes.

26. For instance, records indicate the EIDL funds were used for personal expenses, including but not limited to: a gondola ride at the Venetian Hotel in Las Vegas; high-end retail purchases, including Valentino, Versace, and Gucci; restaurant purchases; and airfare.

27. Further, on or about October 2, 2020, Leguen transferred approximately $64,987.72 in United States currency from the 5202 Account to Leguen's personal installment loan account held at Bank-1, account ending 0001.